SILVERMAN. In re. See Case No. 12,855.

SILVERMAN (UNITED STATES v.). See Case No. 16,288.

━━━━━

# Case No. 12,856.
## The SILVER MOON.
[1 Hask. 262; [1] 11 Int. Rev. Rec. 118.]

District Court, D. Maine. · Feb. Term, 1870.

TRIAL—ADMIRALTY—FORFEITURE—WITHHOLDING EVIDENCE.

1. A claimant present in court during the trial, who does not choose to deny facts within his own knowledge that the witnesses for the libellants have sworn to against him, confesses their truth.

2. The testimony of a party, relative to his own conduct and knowledge, is the best evidence, and the withholding of it awakens distrust and suspicion of evidence less explicit and satisfactory.

In admiralty. Libel in rem by the United States, claiming a forfeiture of the schooner, Silver Moon, for importing liquors in packages smaller than allowed by law. William Decker made claim to the vessel and answered denying the allegations of the libel.

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

George F. Talbot, Dist. Atty., for the United States.

Wales Hubbard and Josiah H. Drummond, for claimant.

FOX, District Judge. This vessel was licensed for the fisheries, and sailed in December, 1865, from Southport for New Brunswick, to obtain a cargo of herring, having a permit to touch and trade. She took on board a portion of her cargo in Back Bay, a place described by the witnesses as situated about twelve or fifteen miles easterly from St. Andrews, and the balance in that vicinity. The charge is, "that a quantity of spirituous liquor was taken on board at St. Andrews, viz: brandy in packages less than fifteen gallons, and rum and gin in packages less than ninety gallons, and thus brought in her to Boothbay in this district, whereby the vessel was forfeited to the United States."

The case is presented for decision under very peculiar circumstances. The libel was filed in April last, and a partial hearing was had at the December term, when the government produced the deposition of one of the crew of the vessel on this voyage, in which he testified that the schooner, after taking on board her cargo of herring, went into St. Andrews; that all hands went on shore, and the master bought, in the presence of all the crew, a lot of brandy, rum, and whiskey, which was put into kegs of five to ten gallons, there being fifteen to twenty kegs in all; that the same were taken by the crew on board the vessel, and brought in her to Boothbay. It was testified by another witness for the government, that soon after the arrival of the Silver Moon, the claimant Decker brought to his house in a sleigh, very early in the morning, eight or ten kegs of liquor, which were put in the cellar, and which Decker said came up in the Silver Moon on the herring trip. Three other witnesses also testified to statements of Decker, that he had liquor come in the Silver Moon on this voyage, to some of whom, at the time, he either sold or gave liquor, which he said came in the schooner on this trip. Decker was called as a witness to prove that the vessel had at the time a permit to touch and trade, but no other inquiries were put to him by the counsel for either party. Others of the crew were in court at the December term while the trial was in progress, but they were not called as witnesses. The counsel for Decker, at this stage, asked for a continuance to the present term, agreeing, as the court understood, that if his request was granted he would not appeal from the decision if adverse, but not advising the court whether he expected to offer any rebutting testimony. At the present term, the master and remainder of the crew, two in number, are called as witnesses by the claimant, and they all testify that the vessel did not go to St. Andrews on this voyage, and was not at any time within six miles of that port, and that the master

did not purchase any liquor at that place. The master states, that his brother-in-law, who resided near Back Bay, procured for him five gallons of brandy at one time, and ten gallons of West India rum afterwards, which were used for ship stores and by the men from the shore who were engaged in catching herring for the Silver Moon, and that no other liquor was bought or taken on board the schooner, excepting a small quantity purchased at Eastport, where they spent Christmas on their way to Back Bay. The seamen in all respects corroborate the master's testimony. The evidence was closed without any inquiries having been put to the claimant concerning his knowledge of liquors having been brought in the vessel, or of his reception of any such liquors, and as he was present, the court thought it not improper to suggest, as it was then about the usual hour of adjournment at noon, that there did not appear, in the minutes of the testimony taken at the December term, any evidence from the claimant, respecting his personal knowledge of or his connection with this alleged importation, and the law permitted him to be a witness in chief in a suit of this nature, in regard to all matters within his own personal knowledge. The court then adjourned. At the afternoon session no further testimony was offered by either party.

In this state of the cause, the testimony of one of the crew being strongly sustained by the acts and declarations of the claimant, as testified to by four other witnesses, and the claimant, although present in court, and well advised of the nature and effect of all this evidence against him, and of its direct bearing upon his own conduct in aid of the illegal importation, not having seen proper to afford by his own evidence any explanation or contradiction thereto, or to purge himself, as of old, from the charge by his own oath, what is the inference which any one must necessarily draw from his silence, under such cogent evidence against him of his personal connection with this transaction? Four witnesses unite in testifying, that at different times, when liquor was present before them either for sale or as a gift, he told them that it came on this trip of the Silver Moon. He knows whether he actually did make these statements, and whether if made by him, they were true or false. No one can know, better than himself, what the truth of the matter really is. He has not denied the statement of a single one of these witnesses, but remains in court with sealed lips, wishing me to presume that all these witnesses have stated falsely, because of the denial by the master and two of his crew, that liquors were imported in the vessel at this time. I admit that there can be no doubt but that on the one side or the other, the rankest perjury has been committed, and if the cause entirely depended on the testimony of those who went in the vessel on the voyage, I should the rather have inclined to give credit to the wit-

nesses for the claimant; but the testimony of the government witness, who was one of the crew the entire voyage, is most direct and circumstantial and persistent, and is corroborated so very forcibly by the other testimony of the acts and declarations of the claimant, that the fact was thus left in very great doubt and uncertainty in my mind, caused to a very great extent by the evidence as to the acts and declarations of the claimant. If the claimant's defence is just and right and true, why should he stand aloof, and in no way help by his own testimony in dissipating the doubts which hang around the cause? Why should the claimant require me to believe, that the witnesses for the government have given false testimony against him, when he is not willing to so assure the court by a denial of their statement under the sanction of his oath? Why this marked, deliberate silence, if he could conscientiously deny the truth of these statements? It is not from any scruples as to taking an oath, as he has testified as to the existence of a permit to touch and trade, and this after the testimony of the government had all been introduced against him; but he was very careful not to allow a word of contradiction to escape his lips. What else can I infer from the course he has adopted, than that the truth would not profit his cause, that he recognizes the binding obligation of an oath, and that in the presence of these witnesses and of their testimony, as a witness he could say nothing contradictory; and that without denial from him, their testimony must be received and acted upon, whatever may be the consequences to his defence? I can only understand from his silence, that the witnesses against him have testified truly, and that if called upon to testify in relation to their evidence, he would corroborate them instead of contradicting them, and would thereby destroy all hope or chance of a defence. I cannot but regard his conduct, in the presence of the court, as a fact which ought to have weight, and influence my decision, in determining with whom the truth in this matter is. The pressure of the government testimony was so severe against him, that I feel confident he would have denied it before me, by his own testimony, if he could have done so conscientiously; and not having denied it in any respect, I consider it equivalent to a positive admission from him that the witnesses in behalf of the government have testified the truth.

Under such circumstances, the claimant was called upon by the strongest considerations, if innocent, to bring to the support of his defence the very best evidence that was in his possession. This evidence existed in his own breast, and although cautioned, he has neglected to produce it for the information of the court, leaving the obvious presumption to be made against him, that the best evidence would be detrimental to his defence. As remarked by a learned writer, "if the weaker and less satisfactory evidence is given and relied on in support of a fact, when it is apparent to the court, that proof of a more explicit and direct character is within the power of a party, the same caution which rejects secondary evidence will awaken distrust and suspicion of the weaker and less satisfactory, and it may well be presumed that if the more perfect exposition had been given, it would have laid open deficiencies and objections which the more obscure and uncertain testimony was intended to conceal." 2 Evans, Poth. Obl. 149. [There is no evidence that the liquors were not landed in open day.] [2] The permit to touch and trade justified the vessel in going to and trading at a foreign port, [and saves her and her cargo from condemnation under the third and fourth counts;] [2] but I am compelled to the conclusion that she did bring to Boothbay as alleged, liquors in packages less than was permitted by the acts of congress, and that for this reason I am bound to adjudge her to be forfeited to the United States.

[Decree of forfeiture of vessel for causes set forth in first count in the libel, and of restoration of the outfits and cargo to the claimant, with certificate of probable cause.] [2]

Let it be so decreed.